## Case No. 14,865.

### UNITED STATES v. COOPER.

[Whart. St. Tr. 659.]

Circuit Court, D. Pennsylvania. April 30. 1800.

SEDITIOUS LIBEL—INTENT OF PUBLICATION—DEFAMATION OF PRESIDENT — CHARGES IN RELATION TO EXTRADITION OF FUGITIVES—STANDING ARMIES.

[1. In a prosecution under the sedition act of July 14. 1798 (1 Stat. 596). for the publication of a libel against the president of the United States. there must clearly appear an intent to defame him. to bring him into contempt and disrepute. and excite against him the hatred of the good people of the United States. If there be no such intent there can be no guilt.]

[2. It is false. within the meaning of the sedition act. to publish that our credit is brought so low that we are obliged to borrow money at 8 per cent. "in time of peace," when, although there has been no declaration of war. there have been actual hostilities. captures of vessels. and a prohibition of intercourse.]

[3. A murder committed on board a British ship of war is committed within the jurisdiction of Great Britain. within the meaning of article 27 of the treaty with that power. relating to the extradition of persons charged with murder and forgery.]

[4. The executive is the party upon whom devolves the duty of surrendering a fugitive in case of extradition under the treaty. and. although he makes use of a judge of the United States as an instrument for ascertaining whether there is sufficient evidence of criminality to require the surrender. the court has no jurisdiction of the crime. and the president cannot truthfully be accused. in connection with such a transaction. of attempting to influence or interfere with a court of justice.]

[5. To publish. in respect to the president. that we are threatened. under his auspices. with the existence of a standing army. betrays either the most egregious ignorance or the most wilful intention to deceive the public: for there are but

two descriptions of armies in the country, one called the "Western Army," enlisted for five years only, and the other called the "Provisional Army," enlisted during the existence of war with France; and neither of these can with any propriety be called a standing army, especially as the constitution declares that no appropriations shall be made for the support of an army longer than two years.]

The libellous matter complained of was as follows: "Nor do I see any impropriety in making this request of Mr. Adams. At that time he had just entered into office. He was hardly in the infancy of political mistake. Even those who doubted his capacity thought well of his intentions. Nor were we yet saddled with the expense of a permanent navy, or threatened, under his auspices, with the existence of a standing army. Our credit was not yet reduced so low as to borrow money at eight per cent. in time of peace, while the unnecessary violence of official expressions might justly have provoked a war. Mr. Adams had not yet projected his embassies to Prussia, Russia and the Sublime Porte, nor had he yet interfered, as president of the United States, to influence the decisions of a court of justice—a stretch of authority which the monarch of Great Britain would have shrunk from—an interference without precedent, against law and against mercy. This melancholy case of Jonathan Robbins, a native citizen of America, forcibly impressed by the British, and delivered up, with the advice of Mr. Adams, to the mock trial of a British court-martial, had not yet astonished the republican citizens of this free country; a case too little known, but of which the people ought to be fully apprised, before the election, and they shall be." [1]

April 11, 1800. The bill was found upon the ex officio action of the district attorney, there having been no previous binding over.

[1] These passages were extracted from the following publication:

"To the Public.

"To the Printer—Sir: I should not condescend to answer anonymous slander, but the information on which the falsehoods contained in the following paragraph are grounded, must have been originally derived from the president himself. I cannot believe him capable of such misrepresentation, for I still think well of his intentions, however I may disapprove of his conduct: but the following narrative will show that some of his underlings are capable of anything:

"From the Reading Weekly Advertiser of October 26, 1799:

"'Communication. Thomas Cooper's address to the readers of the Sunbury and Northumberland Gazette, of which he was editor, having been republished in this state, with an introduction approbatory of the piece, a correspondent wishes to know if it be the same Thomas Cooper, an Englishman, of whom the following anecdote is related? If it is, every paper devoted to truth, honour, and decency, ought to give it a thorough circulation. Not many months ago, it is said, a Mr. Cooper, an Englishman, applied to the president of the United States, to be appointed "agent for settling the respective claims of the citizens and subjects of this country and Great

Some difficulty arose at the outset concerning the right of the defendant to compel the attendance, as witnesses, of several members of congress (congress being then in session), and of the president. An application was made to the court to address a letter to the speaker of the house, requesting him to have process served. This PETERS, Dis-

Britain." In his letter, he informs the president, that although he (Thomas Cooper) had been called a Democrat, yet his real political sentiments are such as would be agreeable to the president and government of the United States, or expressions to that effect. This letter was accompanied with another from Dr. Joseph Priestley, who did not fail to assure the president of the pliability of his friend Cooper's Democratic principles. The president, it is said, rejected Cooper's application with disdain, and Priestley's with still stronger marks of surprise, saying, it is said, as he threw the letter on the table, does he think that I would appoint any Englishman to that important office in preference to an American? What was the consequence? When Thomas Cooper found his application for a lucrative office under our president rejected, he writes in revenge the address which appeared in print, and Dr. Priestley exerted his influence in dispersing this very address, which he must know was the offspring of disappointment and revenge! The address is as cunning and insidious a production as ever appeared in the Aurora or the old Chronicle, and as for impudence, it exceeds, or at least equals, Porcupine himself. Priestley and Cooper are both called upon to deny the above narrative. A recourse to the letters themselves, would establish the accuracy of this anecdote, even to a syllable.'

"Yes; I am the Thomas Cooper alluded to—luckily possessed of more accurate information than the malignant writer of that paragraph, from whatever source his intelligence was derived. About the time of the appointment of commissioners under the British treaty, Doctor Ross, who had sedulously brought about an intercourse of civility between Mr. Liston and myself, urged me to permit him to apply on my behalf to that gentleman, for one of the appointments that must then take place. He pressed on me the folly, as he termed it, of my confining myself to Northumberland, his earnest wish to see me settled in Philadelphia, and the duty I owed my family to better my situation by every means in my power. He stated that Mr. Liston, he knew, thought highly of me, and though the post of the fifth commissioner was probably then disposed of, there must be an agent for the British claimants; an office which, from my situation as a barrister in England, and my knowledge of mercantile transactions, I was peculiarly fitted to fill. I replied, that he probably overrated Mr. Liston's opinion and his own influence, and that, at all events, my known political opinions must render it equally improper for Mr. Liston to give, and for me to accept, any office whatever connected with the British interests. That Mr. Liston and I understood each other on this question, and had hitherto avoided all politics whatever. That, being an American, I should not object to any office under this government, if I could fairly obtain it; but that I would never consent to any application to Mr. Liston. Through Mr. Coleman's interest, Mr. Hall of Sunbury was complimented with the offer of being appointed agent of American claims. On mentioning to Dr. Priestley, one night at supper, that Mr. Hall had declined it, Dr. Ross's persuasions occurred to me, and I said that such an office as that would have suited me very well. Dr. Priestley replied, if that was the case, he thought he had some interest with Mr. Adams, with whom he had long been acquainted, and who had always expressed himself in terms of the highest friendship; that,

trict Judge, acceded to, as the proper course. It was refused, however, by CHASE, Circuit Justice, who ordered process to issue without such letter, saying, at the same time, that if it was necessary to compel the attendance of the members, the case would be continued until the session was over. The court at the same time refused to permit a subpœna to issue, directed to the president of the United States. The cause was then continued to April 19, in order to enable the defendant to procure documentary and other evidence which he considered material.

April 19, 1800. After some difficulty in obtaining the attendance of the members of congress who were subpœnaed, which ap-

as he never intended to ask any favour of Mr. Adams for himself. I might as well let him try for once to ask one for me. On my objecting that Mr. Adams' politics and mine were probably very different, Dr. Priestley declared that this, so far from being an objection, might be an inducement in my favour; for if Mr. Adams meant to be the ruler of a nation, instead of the leader of a party, he would be glad of an opportunity to exhibit such an instance of liberal conduct. At length I consented, expressly requesting Dr. Priestley to take care that Mr. Adams should not mistake my politics. In consequence of this conversation, Dr. Priestley wrote the following letter,—not a few months, but above two years ago:

" 'August 12, 1797. Dear Sir: It was far from being my intention or wish to trouble you with the request of any favours, though it is now in your power to grant them: and it is not at all probable that I shall ever take a second liberty of the kind. But circumstances have arisen which I think call upon me to do it once, though not for myself, but a friend. The office of agent for American claims was offered, I understand, to Mr. Hall of Sunbury, and he has declined it. If this be the case, and no other person be yet fixed upon, I shall be very happy if I could serve Mr. Cooper, a man I doubt not of equal ability, and possessed of every other qualification for the office, by recommending him. It is true, that both he and myself fall, in the language of our calumniators, under the description of Democrats, who are studiously represented as enemies to what is called government, both in England and here. What I have done to deserve that character, you well know, and Mr. Cooper has done very little more. In fact, we have both been persecuted for being friends to American liberty, and our preference of the government of this country has brought us both hither. However, were the accusations true, I think the appointment of a man of unquestionable ability and fidelity to his trust, for which I would make myself answerable, would be truly such a mark of superiority to popular prejudice as I should expect from you. I, therefore, think it no unfavourable circumstance in the recommendation. That you will act according to your best judgment, I have no doubt, with respect to this and other affairs of infinitely more moment, through which I am persuaded you will bring the country with reputation to yourself, though in circumstances of such uncommon difficulty, perhaps with less ease and satisfaction than I could wish. With my earnest wishes for the honour and tranquillity of your presidency, I am, &c., Joseph Priestley.'

"This letter was accompanied by the following from myself:

" 'Sir: On my expressing an inclination for the office which Mr. Hall has declined, Dr. Priestley was so good as to offer his services with you on my behalf. Probably the office will be filled ere this letter can reach you: probably there may be objections to nominating a person not a native of the country: probably the objection mentioned by Dr. Priestley, may reasonably be deemed of weight in my instance. Be all this as it may, I see no impropriety in the present application to be appointed agent of American claims, for it is still possible I may suppose more weight in the objections than they will be found to deserve. If it should so happen that I am nominated to that office, I shall endeavour to merit the character the Doctor has given me, and your esteem. I am, &c., Thomas Cooper.'

"Is this the letter of a man, or not? I do not appeal to the cowardly propagator of anonymous falsehoods, but to the public. What is there in it of vanity or servility? Do not these letters take for granted that I am a Democrat, though not a disturber of all government? and that what I am I shall remain, even though it be deemed a reasonable objection to my appointment? Is this, or is this not, adhering to my principle, whatever becomes of my interest? Nor is it true that my address originated from any motives of revenge. Two years elapsed from the date of those letters, before I wrote anything on the politics of this country. Nor did I recollect them at the time. Nor do I see the objection to taking any fair means of improving my situation. This is a duty incumbent on every prudent man who has a family to raise, and which I have already too much neglected from public motives: nor can any office to which I am eligible in this country, recompense me for the offers I rejected in its favour. But it is not in the power of promises or threats, of wealth or poverty, to extinguish the political enthusiasm which has actuated my conduct for these twenty years. The prudence of middle age and the claims of duty may make me cautious of sacrificing my interest, but they cannot induce me to sacrifice my principle. Nor do I see any impropriety in making this request of Mr. Adams. At that time he had just entered into office. He was hardly in the infancy of political mistake. Even those who doubted his capacity thought well of his intentions. He had not at that time given the public to understand that he would bestow no office but under implicit conformity to his political opinions. He had not declared that 'a republican government may mean anything.' He had not yet sanctioned the abolition of trial by jury in the alien law, or entrenched his public character behind the legal barriers of the sedition law. Nor were we yet saddled with the expense of a permanent navy, or threatened under his auspices with the existence of a standing army. Our credit was not yet reduced so low as to borrow money at eight per cent. in time of peace, while the unnecessary violence of official expressions might justly have provoked a war; nor had the political acrimony which still poisons the pleasures of private society, been fostered by those who call themselves his friends and adherents: nor had the eminent services of Mr. Humphreys at that time received their reward. Mr. Adams had not yet projected his embassies to Prussia, Russia, and the Sublime Porte: nor had he yet interfered, as president of the United States, to influence the decisions of a court of justice: a stretch of authority which the monarch of Great Britain would have shrunk from; an interference without precedent, against law and against mercy! This melancholy case of Jonathan Robbins, a native citizen of America, forcibly impressed by the British, and delivered up, with the advice of Mr. Adams, to the mock trial of a British court martial, had not yet astonished the republican citizens of this free country. A case too little known, but of which the people ought to be fully apprised before the election, and they shall be. Most assuredly, had these transactions taken place in August, 1797, the President Adams would not have been troubled by any request from

　　　　　　　"Thomas Cooper.

"Northumberland, Nov. 2, 1797."

pears ultimately to have been given under a waiver of the supposed privilege; and after considerable altercation between Judge CHASE and the defendant with regard to the character of the evidence to be produced, the jury was sworn, and Mr. Rawle opened the case to the jury substantially as follows:

The defendant stands charged with attempts which the practice and policy of all civilized nations have thought it right at all times to punish with severity, with having published a false, scandalous and malicious attack on the character of the president of the United States, with an intent to excite the hatred and contempt of the people of this country against the man of their choice. It was much to be lamented that every person who had a tolerable facility at writing should think he had a right to attack and overset those authorities and officers whom the people of this country had thought fit to appoint. Nor was it to be endured that foul and infamous falsehoods should be uttered and published with impunity against the president of the United States, whom the people themselves had placed in that high office, and in which he has acted with so much credit to himself and benefit to them. Thomas Cooper stands charged in the indictment as follows: (Here Mr. Rawle read the indictment.) It was a sense of public duty that called for this prosecution. It was necessary that an example should be made to deter others from misleading the people by such false and defamatory publications. There was a peculiarity in the manner also of this publication: we generally observe that persons who take these liberties endeavour to avoid punishment by sheltering themselves under fictitious signatures, or by concealing their names; but the defendant acted very differently. Being of the profession of the law, a man of education and literature, he availed himself of those advantages for the purpose of disseminating his dangerous productions in a remote part of the country where he had gained influence. Such conduct must have arisen from the basest motives. It would be proved to the jury that, at the time of this publication, the defendant went to a magistrate and acknowledged it to be his production, in the same formal manner as if it had been a deed. A conduct so grossly improper had occurred in no instance within his recollection, and the manner constituted no slight aggravation of the offence. Indeed, it was high time for the law to interfere and restrain the libellous spirit which had been so long permitted to extend itself against the highest and most deserving characters. To abuse the men with whom the public has entrusted the management of their national concerns, to withdraw from them the confidence of the people, so necessary for conducting the public business, was in direct opposition to the duties of a good citizen. Mischiefs of this kind were to be dreaded in proportion as the country around is less informed, and a man of sense and education has it more in his power to extend the mischief which he is inclined to propagate. Government should not encourage the idea, that they would not prosecute such atrocious conduct; for if this conduct was allowed to pass over, the peace of the country would be endangered. Error leads to discontent, discontent to a fancied idea of oppression, and that to insurrection, of which the two instances which had already happened were alarming proofs, and well-known to the jury. That the jury, as citizens, must determine whether, from publications of this kind, the prosperity of the country was not endangered; and whether it was not their duty, when a case of this nature was laid before them and the law was applicable, to bring in such a verdict as the law and the evidence would warrant; and show, that these kinds of attacks on the government of the country were not to be suffered with impunity.

Mr. Rawle, after reading the section of the sedition act applicable to the case on trial, proceeded to call John Buyers, who testified as follows: "I know this paper. Mr. Cooper brought it to me on the evening of the 6th of December, 1799, at my house at Sunbury. He came to me at the door of my house. Asked me to walk in. We walked in. This was between candle-light and day-light. He asked for a candle. He perused this paper which I have in my hand, pointed to his name, and said, 'This is my name, and I am the author of this piece.' There was nothing further passed, only he said, 'This may save you trouble another time.' I knew very well what he meant by it."

Cross-examined by Mr. Cooper: "Had not you and I been in the habit of frequently joking with each other upon political subjects? Ans. O yes—very often."

Mr. Rawle here read that part of the publication which is included in the indictment, for which reason it is omitted here.

Mr. Cooper then addressed the jury as follows:

If it were true, as it is not true, that, in the language of the attorney general of the district, I have been guilty of publishing with the basest motives a foul and infamous libel on the character of the president; of exciting against him the hatred and contempt of the people of this country, by gross and malicious falsehoods—then, indeed, would it be his duty to bring me before this tribunal, it would be yours to convict, and the duty of the court to punish me. But I hope, in the course of this trial, I shall be enabled to prove to your satisfaction, that I have published nothing which truth will not justify. That the assertions for which I am indicted are free from malicious imputation, and that my motives have been honest and

fair. You will observe, gentlemen of the jury, that the law requires it to be proved as a necessary part of the charge, that the passages for which I am indicted should be false and scandalous, and published from malicious motives: and before you will be able, consistently with your oaths, to convict upon this indictment. you must be thoroughly satisfied that both these parts of the charge are well founded. Nor does it appear to me that the expression of the act, to bring the president into contempt, can be fulfilled, if the accusation, as in the present instance, related to an examination of his public conduct, and no improper motives are imputed to him. And that I have carefully avoided imputing any impropriety of intention to the president, even in the very paper complained of; that the uniform tenor of my conduct and language has been to attribute honesty of motive even where I have strongly disapproved of the tendency of his measures, I can abundantly show. You, and all who hear me, well know that this country is divided, and almost equally divided, into two grand parties; usually termed, whether properly or improperly, Federalists and Anti-Federalists: and that the governing powers of the country are ranked in public opinion under the former denomination—of these divisions, the one wishes to increase, the other to diminish, the powers of the executive; the one thinks that the people (the democracy of the country) has too much, the other too little, influence on the measures of government: the one is friendly, the other hostile, to a standing army and a permanent navy: the one thinks them necessary to repel invasions and aggressions from without, and commotions within; the other, that a well-organized militia is a sufficient safeguard for all that an army could protect, and that a navy is more dangerous and expensive than any benefit derived from it can compensate; the one thinks the liberties of our country endangered by the licentiousness, the other, by the restrictions of the press. Such are some among the leading features of these notorious divisions of political party. It is evident, gentlemen of the jury, that each will view with a jealous eye the positions of the other, and that there cannot but be a bias among the partisans of the one side, against the principles and doctrines inculcated by the other. In the present instance, I fear it cannot but have its effects; for, without impeaching the integrity of any person directly concerned in the progress of the present trial, I may fairly state that, under the sedition law, a defendant, such as I stand before you, is placed in a situation unknown in any other case. Directly or indirectly, the public, if not the private, character of the president of the United States is involved in the present trial. Who nominates the judges who are to preside, the juries who are to judge of the evidence, the marshal

who has the summoning of the jury? The president. Suppose a case of arbitration concerning the property of any one of you, where the adverse party should claim the right of nominating the persons whose legal opinions are to decide the law of the question, and of the very man who shall have the appointment of the arbitrators—what would you say to such a trial? and yet in fact such is mine, and such is the trial of every man who has the misfortune to be indicted under this law. But although I have a right to presume something of political bias against my opinions, from the court who try me, to you who sit there as jurymen, I am still satisfied you will feel that you have some character to support and some character to lose; and whatever your opinions may be on the subjects alluded to in the indictment, you will reverence as you ought the sacred obligation of the oath you have taken. Gentlemen of the jury, I acknowledge, as freely as any of you can, the necessity of a certain degree of confidence in the executive government of the country. But this confidence ought not to be unlimited, and need not be paid up in advance; let it be earned before it be reposed; let it be claimed by the evidence of benefits conferred, of measures that compel approbation, of conduct irreproachable. It cannot be exacted by the guarded provisions of sedition laws, by attacks on the freedom of the press, by prosecutions, pains and penalties on those who boldly express the truth, or who may honestly and innocently err in their political sentiments. Let this required confidence be the meed of desert, and the public will not be backward to pay it. But in the present state of affairs, the press is open to those who will praise, while the threats of the law hang over those who blame the conduct of the men in power. Indiscriminate approbation of the measures of the executive is not only unattacked, but fostered, and received with the utmost avidity; while those who venture to express a sentiment of opposition must do it in fear and trembling, and run the hazard of being dragged like myself before the frowning tribunal, erected by the sedition law. Be it so; but surely this anxiety to protect public character must arise from fear of attack. That conduct which will not bear investigation will naturally shun it; and whether my opinions are right or wrong, as they are stated in the charge, I cannot help thinking they would have been better confuted by evidence and argument than by indictment. Fines and imprisonment will produce conviction neither in the mind of the sufferer nor of the public. Nor do I see how the people can exercise on rational grounds their elective franchise, if perfect freedom of discussion of public characters be not allowed. Electors are bound in conscience to reflect and decide who best deserves their suffrage; but how can they do it, if these prosecutions in terrorem close

all the avenues of information, and throw a veil over the grossest misconduct of our periodical rulers? After having offered these preliminary remarks, I shall give an account of the paper on which I am accused, and then proceed to examine the charges of the indictment in the order in which they are laid: much that I intended to have advanced I must relinquish, that I may not trespass too long on your time, or weaken the effect of my own defence by fatiguing your attention. The scored paper now handed to me by the attorney general, suggests an observation which, though 'trite, is material. Upon the plan usually adopted in these ex officio accusations, a good Christian might easily be proved an arrant atheist. "The fool hath said in his heart, there is no God." Take the four last words, and they are atheistical: take the sentence, and it is Scripture. So, take the marked passages in this paper, and they may, perhaps, be forced into something like improper imputation against the president: take the paper itself, and the very first paragraph is a plain and positive approbation of his intention. Though I must acknowledge that, however upright I might formerly have believed his motives of action, I cannot, upon reflection, pay that tribute to his conduct or his motives on the present occasion. The general circumstances that gave rise to the paper I now hold, are these: Dr. Priestley, a man whose name implies a greater combination of learning, science, and ability, of important discovery, of exertion for the benefit of mankind, and of private integrity, than any other man now living can boast—whose conduct towards me, in the instance detailed in this paper, is praise sufficient to bear up my mind against any consequences which the present trial can produce—had long been an acquaintance and an intimate acquaintance of Mr. Adams, in England and in this country. The letters of the latter to Dr. Priestley are full of strong expressions of friendship and esteem. Relying upon this long intercourse of cordiality between them, Dr. Priestley urged me to permit him to write to Mr. Adams on the subject of a vacancy mentioned in this paper, and which, as you will have it before you when you retire, I shall not read at length. This application was from one friend to another; upon the face of it a confidential communication; although containing nothing but what might do credit to all the parties concerned. Mr. Adams, however, did not think it so confidential; and from some disclosure on his part, has been founded the base and cowardly slander which dragged me in the first instance before the public in vindication of my moral and political character, and has at length dragged me before this tribunal, to protect, if I can, my personal liberty and my private fortune, against the legal attack of an ex officio information. Hence, it is evident, gentlemen of the jury, that this is not a vol-

untary, but an involuntary publication on my part: it has originated, not from motives of turbulence and malice, but from self-defence; not from a desire of attacking the character of the president, but of vindicating my own. And in what way have I done this? My motives, my private character, my public character, were the object of falsehood and calumny, apparently founded on information of high authority. In reply, I give credit to the intentions of the president: I say nothing of his private character; and I attack only the tendency of measures notorious to the world, which, having been known to disapprove publicly, I was charged with being ready, from motives of interest, to approve privately. I think, gentlemen, you cannot help feeling this contrast of behaviour, and if the president is satisfied with his side of the picture, I am mine.

The first article selected for accusation is, that, at the time I allude to, "he was but in the infancy of political mistake." Why this expression should have been fixed on as seditious, I know not, unless it be that "quem deus vult perdere prius dementat"; for have we advanced so far on the road to despotism in this republican country, that we dare not say our president may be mistaken? Is a plain citizen encircled at once by the mysterious attribute of political infallibility the instant he mounts the presidential chair? If so, then indeed may it be seditious to say he is mistaken; but before you can condemn me for this kind of sedition, you must become catholic believers in this new-fangled doctrine of infallibility. I know that in England the king can do no wrong, but I did not know till now that the president of the United States had the same attribute. I have said (and I am accused for saying it) "that even those who doubted his capacity thought well of his intentions." Is it a crime to doubt the capacity of the president? Suppose I had said that there were some who did not give him credit for capacity sufficient for the office he holds, is that a crime? Or if in them, is it a crime in me, who have not said it? Nor can the word "capacity" here be fairly construed into any other than a comparative meaning; for surely no one who has read his defence, as it is called, of the American constitution, or who reflects that he has had abilities enough to raise himself to his present situation, can say that he is devoid either of industry or talents. But those who voted for his opponent must have believed Mr. Adams of inferior capacity to that gentleman. Of that number was I; of that number was at least one-half of the people of the United States. If it be a crime thus to have thought and thus to have spoken, I fear I shall continue in this respect incorrigible. But if of two constructions the one is absurd, improbable and unfavourable, surely it should be rejected in favour of that meaning which was most likely to have occurred, and which in its effects will do

least injury to a defendant like myself. This is common, this is legal charity. "Nor had we yet, under his auspices, been saddled with the expense of a permanent navy." Gentlemen, is it true or not that we are saddled with the expense of a permanent navy? Is it necessary that I should enter into a detail of authorities to prove that the sun shines at noon-day? But farther, is it true that we incur this expense under his auspices and sanction? I have before me two publications: the one the Gazette of the United States, published by Mr. Fenno in this city; and another, in a form more portable and convenient, purporting to be a selection of addresses and answers to and from the president during the summer of 1798. Not having been able to procure office copies of the documents I wished to refer to, I must offer in evidence such publications as I can find; that class of publications, upon which in fact the mind of the public is usually made up; and upon whose authority the electors of this country determine the characters whom they honour with their suffrage. Indeed, if the opinion that fell from the court this morning be accurate, that no man should hazard an assertion but upon sufficient and legal evidence, and if documents from the public offices in proof of notorious facts are required as such evidence, then are the mouths of the people completely shut up on every question of public conduct or public character: but I cannot help thinking it a fair and reasonable, position, that a defendant in such a case as this should be permitted to offer to the jury any evidence that appears to him a sufficient ground for his assertion, and let them decide on its credibility.

CHASE, Circuit Justice. What is it that you say, sir, fell from the court? They have not yet decided what was or what not proper evidence for you to adduce. The court said, if you thought the public documents at your service, you were mistaken. If you undertake to publish, without having proper evidence before you to justify your assertions, you do it at your own risk. Most assuredly, in common traverses, you could not offer the evidence you mention. But we acknowledge that, in such a case as this, greater latitude may be given. If you say the president did write a letter, you must prove it. We should incline to admit gazettes and acts of public authority and notoriety: you might read the speech of the president to both houses of congress in evidence. If you want to prove that the president advocated a navy, you may read the journals of congress or any authentic public document.

Mr. Cooper. If I am defeated in my endeavours to procure these documents, I must offer such evidence as I can procure; and where there is no reasonable suspicion or assignable motive why the publications I offer should misrepresent the transactions I allude to, the probability is in favour of their accuracy; especially when the printers of them are severely punishable for wilful misrepresentation or gross mistake in detailing the public acts of government.

PETERS, District Judge. I admit a great many things from Mr. Cooper, who is without counsel, which I would not admit from others.

CHASE, Circuit Justice. You may read anything and everything you please.

Mr. Cooper then went on to argue at great length, from a copious collection from the public documents of the day, that the policy of the president had been to saddle upon the country a permanent navy and army, and to keep down the liberties of the citizens by his arbitrary interference in the case of Jonathan Robbins. He then said:

Gentlemen, I have gone through all the charges, and I am satisfied that I have brought in support of my assertions the best evidence the nature of my case would admit of. It is true, by resorting to Danbury for depositions and to Charlestown for records, I might have made the evidence in the last charge more complete; but I did not and do not think them necessary to produce further conviction on your minds than you feel on the subject already. This is an important point under the law in question. If such strictness of testimony is required, there is an end at once of all political conversation in promiscuous society. The time, the labour, the difficulty, the expense, the harassment and fatigue of mind as well as of body, which such doctrine would occasion to every citizen whom a corrupt administration might determine to ruin, would be an engine of oppression of itself sufficiently powerful to establish a perfect despotism over the press; and would be a punishment for innocence before trial, too severe to be inflicted on sedition itself. I think you must feel the truth of these remarks: the proceedings on this trial irresistibly suggest them. Gentlemen, if the assertions I have made are true, whatever the motives of them may be, you cannot find me guilty. But I think it impossible, if you consider the paper altogether, that you can ascribe the publication of it to malice: it is on the face of it not voluntary, but compelled. I have, in the very outset of the paper, spoken well of the president: I have been in the habit of thinking his intentions right, and his public conduct wrong: and that this has been the general tenor of my language and behaviour, I believe I can even now bring proof enough from among my friends and my neighbors.

CHASE, Circuit Justice. This is not necessary: it is your conduct, not your character, that is in question. If this prosecution were for a crime against the United States, you might give evidence to your character, and show that you have always been a good citizen; but this is an indictment for a libel against the president, where your general character is not in question.

Mr. Cooper. I am satisfied. I shall fatigue the jury no longer; but rest my defence here. Mr. Rawle, in reply, said:

Gentlemen of the jury, the defence you have just heard is one of the most extraordinary and unexampled I ever remember to have witnessed in a court of justice. It is no less than to call into decision whether Thomas Cooper, the defendant, or the president of the United States, to whom this country has thought proper to confide its most important interests, is best qualified to judge whether the measures adopted by our government are calculated to preserve the peace and promote the happiness of America. This, however, does not seem to me the real point which you are to try; and I shall therefore (under direction of the court) proceed to state what I conceive to be the question which you, gentlemen of the jury, are now called upon to determine. Thomas Cooper is charged in the indictment with having published a false, scandalous and malicious libel, with intent to defame the president of the United States, and to bring him into contempt and disrepute, and to excite against him the hatred of the good people of this country. In the act which defines this offence and points out the punishment, a liberality of defence is given, unknown, I believe, in any other country where the party is tried for a libel on the government. Here the defendant is allowed, under the third section of that act, to give in evidence the truth of the matters charged as a libel in the publication. and the jury have a right to determine the law and the fact under the direction of the court. The true spirit of the law is that the defendant shall not be found guilty of publishing defamatory writings, unless they be false, nor, although they may be false, shall he be considered as guilty under the law, unless the intent of the publication appear to be malicious. That such publication has proceeded upon a knowledge of the truth, he is permitted to give as matter of evidence; and if true, it must be allowed to go so far to satisfy the minds of the jury that the malicious motives imputed to him are not true. In private actions for slander, where a man seeks pecuniary redress for the injury his character has sustained. the defendant is entitled to give in evidence, as a defence to the action, the truth of the words spoken or the written libel; and if the truth of the assertions be proved, it will amount to a justification. There is no difference, then. between the defence that may be set up to an action of slander, or libel on a private person, and that which is permitted under the law whereon this indictment is grounded. The defendant has undertaken to satisfy the mind of the jury that, in this publication. he had no malicious intention against the president of the United States; I join issue with him on the point, and request your particular attention to it. He alleges that he did not impute improper motives to the president, and

attempts to substantiate his allegation by referring you to his declaration in the outset, where he says that "I cannot believe him (the president) capable of such gross misrepresentations, for I still think well of his intentions. however I may disapprove of his conduct." But to this I shall add that he goes on and concludes with a paragraph, evincing in the clearest manner a settled design to persuade the public that the president of the United States is not fit for the high office he bears, and of this you must be fully convinced from the whole tenor of the expressions which have been read to you in the indictment. It is very far from my views to press hard upon any part of his long address to you, or to make use against him of any unguarded expression, which, on more deliberate consideration, he might have omitted or corrected; yet, when I cannot but observe, from the whole tenor of his present argument. as well as from his publication, that his object is not so much to convince you, gentlemen of the jury, that his assertions are true, as to cast an unmerited reflection on the general character and conduct of the president, I cannot help suspecting him of the motives he disclaims, and I must do my duty by exposing the design as well as the fallacy of the justification he has set up. The defendant has used a little observation respecting the separating in the indictment the text from the context, as I believe he was pleased to term it; and argued that by this means the most upright intentions and laudable expressions might be perverted from their true and obvious meaning. Such an insinuation, however; is not calculated to influence your minds. In framing an indictment, it is my duty to leave out matters of little importance, and to introduce those circumstances only that are truly and legally reprehensible: and he well knows that he can read, if he pleases, the whole of the publication, and that you will have it with you when you consider of your verdict. You will judge, therefore, whether by this observation, it was his, or whether it is my design to confound and perplex the sense. Whether the reflections he has thrown upon the conduct of government. in so many instances throughout his defence as well as in his publication, evince the regard he professes to entertain for the intentions of the president. is to me, as it will be to you. extremely dubious; nor have those professions been confirmed by the singular manner in which he has cited and selected the passages on which his defence has been grounded. Throughout the quotations he has made, particularly from the addresses to the president, and the answers to them, there has been a series of misrepresentations, which it will be my duty to observe upon when I come to consider that part of the charge and his vindication of it. But it is fair to observe that if. from the perusal of partial extracts and passages selected from various publications, he has thought proper

to publish a libel, such as that for which he is indicted, against the character of our president, there is no excuse for his conduct; if, on the other hand, he had the whole of the publications before him, and has extracted from them partially and unfairly, his conduct is still more reprehensible, and there is the less excuse, as it is evident, and as you, gentlemen of the jury, must have observed, that he is a man of talents and letters.

Mr. Rawle then proceeded to consider at great length the several points of justification started by Mr. Cooper, and then said:

Gentlemen, you have attended to the words of this charge in the indictment, and you cannot but be impressed that they convey on the face and in the very tenor of them, a conclusive proof of a mala mens, of a malicious and deliberate intention to injure the character of the president: no man can read them without receiving this impression from the perusal. I have not touched on the article respecting the embassies to Prussia, Russia, and the Porte; because I did not think it of importance sufficient to occupy much of your time. Indeed, I believe no embassy was ever sent to Russia. There is enough for your consideration against the defendant, without dwelling on these lesser articles of the indictment. Gentlemen, I have no personal animosity against Mr. Cooper; but I have instituted this prosecution because I thought it my duty so to do, and I must make those remarks which the same duty calls forth. The defendant has endeavoured to show that his publication was without malice; but his conduct with Buyers, and his expressions in that publication, prove otherwise: the nature of his defence, though he has stated his opinion of the good intentions of the president, evidently shows that he meant to justify his own conduct and language throughout. You, gentlemen of the jury, under the direction of the court, will decide whether he has presented to you such a justification as will entitle him to your verdict in his favour.

CHASE, Circuit Justice (charging jury). Gentlemen of the jury: When men are found rash enough to commit an offence such as the traverser is charged with, it becomes the duty of the government to take care that they should not pass with impunity. It is my duty to state to you the law on which this indictment is preferred, and the substance of the accusation and defence. Thomas Cooper, the traverser, stands charged with having published a false, scandalous and malicious libel against the president of the United States, in his official character as president. There is no civilized country that I know of, that does not punish such offences; and it is necessary to the peace and welfare of this country, that these offences should meet with their proper punishment, since ours is a government founded on the opinions and confidence of the people. The representatives and the president are chosen by the people. It is a government made by themselves; and their officers are chosen by themselves; and, therefore, if any improper law is enacted, the people have it in their power to obtain the repeal of such law, or even of the constitution itself, if found defective, since provision is made for its amendment. Our government, therefore, is really republican; the people are truly represented, since all power is derived from them. It is a government of representation and responsibility. All officers of the government are liable to be displaced or removed, or their duration in office limited by elections at fixed periods. There is one department only, the judiciary, which is not subject to such removal; their offices being held "during good behaviour," and therefore they can only be removed for misbehaviour. All governments which I have ever read or heard of punish libels against themselves. If a man attempts to destroy the confidence of the people in their officers, their supreme magistrate, and their legislature, he effectually saps the foundation of the government. A republican government can only be destroyed in two ways; the introduction of luxury, or the licentiousness of the press. This latter is the more slow, but most sure and certain, means of bringing about the destruction of the government. The legislature of this country, knowing this maxim, has thought proper to pass a law to check this licentiousness of the press: by a clause in that law it is enacted. (Judge CHASE here read the second section of the sedition law.) It must, therefore, be observed, gentlemen of the jury, that the intent must be plainly manifest. It is an important word in the law; for if there is no such intent to defame, &c., there is no offence created by that law. Thomas Cooper, then, stands indicted for having published a false, scandalous and malicious libel upon the president of the United States, with intent to defame the president, to bring him into contempt and disrepute, and to excite against him the hatred of the good people of the United States. This is the charge. The traverser has pleaded not guilty, and that he has not published, &c., with these views. He has also pleaded in justification (which the law provides for), that the matters asserted by him are true, and that he will give the same in evidence.

It is incumbent on the part of the prosecution to prove two facts: (1) That the traverser did publish the matters contained in the indictment. (2) That he did publish with intent to defame, &c. For the intent is as much a fact as the other, and must be proved in the same manner as other facts; and must be proved as stated in the law of congress— the mere publication is no offence; and in making up your verdict, though you consider them separately, you must take the whole tenor and import of the publication, since the offence is committed by the two coupled together.

First, then, as to the publication. The fact of writing and publishing is clearly proved; nay, in fact, it is not denied. It is proved to have taken place at Sunbury, a considerable distance from the seat of government. It appears from the evidence that the traverser went to the house of a justice of the peace with this paper, whom, of all others, he ought to have avoided; for he must know that it was the duty of the justice of the peace to deliver it immediately to those who administer the government. He did so. It was indecent to deliver such a paper to a justice of the peace, and the manner in which it was delivered was yet more outrageous—if it was done in joke, as the traverser would wish to imply, it was still very improper—but there was the same solemnity in his expression, "This is my name, and I am the author of this handbill," as if the traverser was going to part with an estate. This conduct showed that he intended to dare and defy the government, and to provoke them, and his subsequent conduct satisfies my mind that such was his disposition. For he justifies the publication in all its parts, and declares it to be founded in truth. It is proved most clearly to be his publication. It is your business to consider the intent as coupled with that, and view the whole together. You must take that publication, and compare it with the indictment. If there are doubts as to the motives of the traverser, he has removed them; for, though he states in his defence that he does not arraign the motives of the president, yet he has boldly avowed that his own motives in this publication were to censure the conduct of the president, which his conduct, as he thought, deserved. Now, gentlemen, the motives of the president, in his official capacity, are not a subject of inquiry with you. Shall we say to the president, you are not fit for the government of this country? It is no apology for a man to say, that he believes the president to be honest, but that he has done acts which prove him unworthy the confidence of the people, incapable of executing the duties of his high station, and unfit for the important office to which the people have elected him: the motives and intent of the traverser, not of the president, are the subject to be inquired into by you.

Now we will consider this libel as published by the defendant, and observe what were his motives. You will find the traverser speaking of the president in the following words: "Even those who doubted his capacity, thought well of his intentions." This the traverser might suppose would be considered as a compliment as to the intentions of the president; but I have no doubt that it was meant to carry a sting with it which should be felt; for it was in substance saying of the president, "You may have good intentions, but I doubt your capacity." He then goes on to say: "Nor were we yet saddled with the expense of a permanent navy, nor threatened, under his (the president's) auspices, with the

existence of a standing army. Our credit was not yet reduced so low as to borrow money at eight per cent. in time of peace." Now, gentlemen, if these things were true, can any one doubt what effect they would have on the public mind? If the people believed those things, what would be the consequence? What! the president of the United States saddle us with a permanent navy, encourage a standing army, and borrow money at a large premium? And are we told, too, that this is in time of peace? If you believe this to be true, what opinion can you, gentlemen, form of the president? One observation must strike you, viz.: That these charges are made not only against the president, but against yourselves who elect the house of representatives, for these acts cannot be done without first having been approved of by congress. Can a navy be built, can an army be raised, or money borrowed, without the consent of congress? The president is further charged for that "the unnecessary violence of his official expressions might justly have provoked a war." This is a very serious charge indeed. What, the president, by unnecessary violence, plunge this country into a war! and that a just war? It cannot be —I say, gentlemen, again, if you believe this, what opinion can you form of the president? Certainly the worst you can form: you would certainly consider him totally unfit for the high station which he has so honorably filled, and with such benefit to his country. The traverser states that, under the auspices of the president, "our credit is so low that we are obliged to borrow money at eight per cent. in time of peace." I cannot suppress my feelings at this gross attack upon the president. Can this be true? Can you believe it? Are we now in time of peace? Is there no war? No hostilities with France? Has she not captured our vessels and plundered us of our property to the amount of millions? Has not the intercourse been prohibited with her? Have we not armed our vessels to defend ourselves, and have we not captured several of her vessels of war? Although no formal declaration of war has been made, is it not notorious that actual hostilities have taken place? And is this, then, a time of peace? The very expense incurred, which rendered a loan necessary, was in consequence of the conduct of France. The traverser, therefore, has published an untruth, knowing it to be an untruth.

The other part of the publication is much more offensive. I do not allude to his assertions relating to the embassies to Prussia, Russia, and the Sublime Porte. They are matters of little consequence, and, therefore, I shall pass over them. The part to which I allude is that where the traverser charges the president with having influenced the judiciary department. I know of no charge which can be more injurious to the president than that of an attempt to influence a court of judicature; the judicature of the country is of the greatest consequence to the liberties and existence of a nation. If your constitution was de-

stroyed, so long as the judiciary department remained free and uncontrolled, the liberties of the people would not be endangered. Suffer your courts of judicature to be destroyed; there is an end to your liberties. The traverser says that this interference was a stretch of authority that the monarch of Great Britain would have shrunk from; an interference without precedent, against law and against mercy. Is not this an attack, and a most serious attack on the character of the president? The traverser goes on thus: "This melancholy case of Jonathan Robbins, a native of America, forcibly impressed by the British, and delivered, with the advice of Mr. Adams, to the mock trial of a British court-martial, had not yet astonished the republican citizens of this free country,—a case too little known, but of which the people ought to be fully apprised before the election, and they shall be." Now, gentlemen, there are circumstances in this publication which greatly aggravate the offence. The traverser does not only tell you that the president interfered to influence a court of justice without precedent, against law and against mercy; but that he so interfered in order to deliver up a native American citizen to be executed by a British court-martial under a mock trial, against law and against mercy. Another circumstance is adduced to complete the picture. He tells you that this Robbins was not only an American, but a native American, forcibly impressed by the British; and yet that the president of the United States, without precedent, against law and against mercy, interfered with a court of justice, and ordered this native American to be delivered up to a mock trial by a British court-martial. I can scarcely conceive a charge can be made against the president of so much consequence, or of a more heinous nature. But, says Mr. Cooper, he has done it. I will show you the case in which he has done it. It is the case of Jonathan Robbins. It appears then that this is a charge on the president, not only false and scandalous, but evidently made with intent to injure his character, and the manner in which it is made is well calculated to operate on the passions of Americans, and I fear such has been the effect. If this charge were true, there is not a man amongst you but would hate the president. I am sure I should hate him myself if I had thought he had done this. Upon the purity and independence of the judges depend the existence of your government and the preservation of your liberties. They should be under no influence—they are only accountable to God and their own consciences —your present judges are in that situation.

There is a little circumstance which the attorney-general, in his observations to you, omitted to state, but which I think it right to recall to your recollection, as it appears with what design the traverser made this publication. In this allusion to Jonathan Robbins he expressly tells you this is "a case too little known, but of which the people ought to be

fully apprised before the election, and they shall be." Here, then, the evident design of the traverser was, to arouse the people against the president so as to influence their minds against him on the next election. I think it right to explain this to you, because it proves, that the traverser was actuated by improper motives to make this charge against the president. It is a very heavy charge, and made with intent to bring the president into contempt and disrepute, and excite against him the hatred of the people of the United States. The traverser has read in evidence a report made by the president to the house of representatives, and a letter written by the secretary of state, to show that the president had advised and directed this Robbins to be given up; but subsequent facts could not excuse the traverser for what he had written before. Now, gentlemen, with regard to this delivery of Jonathan Robbins, I am clearly of opinion that the president could not refuse to deliver him up. This same Jonathan Robbins, whose real name appears to have been Nash, was charged with murder committed on board the Hermione, British ship of war. This Nash being discovered in America, the British minister made a requisition to the president that he should be delivered up. Then we must inquire whether the president was obliged to give him up? By the twenty-seventh article of the treaty with Great Britain, it is stipulated, "that either of the contracting parties will deliver up to justice all persons who, being charged with murder or forgery committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other. provided this shall be done only on such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the offence had been there committed." If the president, therefore, by this treaty, was bound to give this Nash up to justice, he was so bound by law; for the treaty is the law of the land: if so, the charge of interference to influence the decisions of a court of justice, is without foundation. The reason why this article was inserted in the treaty, is evident. Murder is a crime against the laws of God and man, and ought never to be committed with impunity. Forgery is an offence affecting all commercial countries, and should never go unpunished; and therefore every government, especially a commercial one, acts wisely in delivering fugitives guilty of such crimes to justice. Nash was charged with having committed murder on board a British ship of war. Now a dispute has arisen whether murder committed on board such a ship of war, was committed within the jurisdiction of Great Britain. I have no doubt as to the point. All vessels, whether public or private, are part of the territory and within the jurisdiction of the nation to which they belong. This is according to the law of nations. All nations have this jurisdiction, and the reason is obvi-

ous, for every country carrying on commerce, is answerable to other nations for the conduct of their subjects on the ocean. Were it not so, crimes committed on board vessels of war would go unpunished; for no other country can claim jurisdiction. This person, then, was charged with murder committed on board a British ship of war. I say it was committed within the jurisdiction of Great Britain. By the constitution, (since the treaty is the law of the land,) America was bound to give him up: but who is the person to deliver up a fugitive according to that article in the treaty? The president was the only person to take the proper steps, and to take cognizance of the business. He represents the United States in their concerns with foreign powers. This affair could not be tried before a court of law. No court of justice here has jurisdiction over the crime of murder committed on board a British ship of war. Now, as the requisition was made to the president on the part of the British government to deliver this man up, it became necessary to know whether there was sufficient evidence of his criminality pursuant to the treaty. The judge of the court of Carolina was therefore called upon to inquire into the evidence of his criminality. He was the instrument made use of by the president to ascertain that fact. His delivery was the necessary act of the president, which he was by the treaty and the law of the land, bound to perform; and had he not done so, we should have heard louder complaints from that party who are incessantly opposing and calumniating the government, that the president had grossly neglected his duty by not carrying a solemn treaty into effect. Was this, then, an interference on the part of the president with the judiciary without precedent, against law and against mercy; for doing an act which he was bound by the law of the land to carry into effect, and over which a court of justice had no jurisdiction? Surely not; neither has it merited to be treated in the manner in which the traverser has done in his publication. A defence of greater novelty I never heard before.

Take this publication in all its parts, and it is the boldest attempt I have known to poison the minds of the people. He asserts that Mr. Adams has countenanced a navy, that he has brought forward measures for raising a standing army in the country. The traverser is certainly a scholar, and has shown himself a man of learning, and has read much on the subject of armies. But to assert, as he has done, that we have a standing army in this country, betrays the most egregious ignorance, or the most wilful intentions to deceive the public. We have two descriptions of armies in this country—we have an army which is generally called the Western army, enlisted for five years only—can this be a standing army? Who raises them? Congress. Who pays them? The people. We have also another army, called the provisional army, which is enlisted during the existence

of the war with France—neither of these can, with any propriety, be called a standing army. In fact, we cannot have a standing army in this country, the constitution having expressly declared that no appropriation shall be made for the support of an army longer than two years. Therefore, as congress may appropriate money for the support of the army annually, and are obliged to do it only for two years, there can be no standing army in this country until the constitution is first destroyed. There is no subject on which the people of America feel more alarm, than the establishment of a standing army. Once persuade them that the government is attempting to promote such a measure, and you destroy their confidence in the government. Therefore, to say, that under the auspices of the president, we were saddled with a standing army, was directly calculated to bring him into contempt with the people, and excite their hatred against him.

It is too much to press this point on the traverser. But he deserves it. This publication is evidently intended to mislead the ignorant, and inflame their minds against the president, and to influence their votes on the next election. The traverser says, he has proved that the president has advocated a standing army—how has he proved it? There is no standing army; I have before stated, the army is only raised for five years, and during the existing differences—he tells you, Mr. Adams is a friend to the establishment of a navy; I wonder who is not a friend to a navy which is to protect the commerce and power of this country. The traverser has, to prove these points, read to you many extracts from the addresses and answers to the president. He has selected a number of passages, which, he asserts, prove the approbation of the president to the creation of a navy, and forming a standing army. But we are to recollect gentlemen, that when in consequence of the unjust proceedings of France, the great mass of the people thought proper to address the president, expressing in those addresses, sentiments of attachment and confidence in the president, and their determination to resist the oppression of the French government, the president replied to them, in answers which generally were the echo of their sentiments, and in fact, his expressions were as general as the nature of the addresses would permit—therefore, the traverser ought to have blamed the addressers, and not the president. The Marine Society of Boston, as old seamen, address the president in favour of a navy. The president in reply, thinks a navy is the proper defence of the country.

I believe, gentlemen, in the first part of my charge, I made remarks on the assertions of the traverser, that the president had borrowed money at eight per cent. in time of peace. Therefore, it will not be necessary to enlarge on that point. You will please to notice, gentlemen, that the traverser in his defence must prove every charge he has made to be true;

he must prove it to the marrow. If he asserts three things, and proves but one, he fails; if he proves but two, he fails in his defence, for he must prove the whole of his assertions to be true. If he were to prove, that the president had done everything charged against him in the first paragraph of the publication—though he should prove to your satisfaction, that the president had interfered to influence the decisions of a court of justice, that he had delivered up Jonathan Robbins without precedent, against law and against mercy, this would not be sufficient, unless he proved at the same time, that Jonathan Robbins was a native American, and had been forcibly impressed, and compelled to serve on board a British ship of war. If he fails, therefore, gentlemen, in this proof, you must then consider whether his intention in making these charges against the president were malicious or not. It is not necessary for me to go more minutely into an investigation of the defence. You must judge for yourselves—you must find the publication, and judge of the intent with which that publication was made, whether it was malice or not? If you believe that he has published it without malice, or an intent to defame the president of the United States, you must acquit him. If he has proved the truth of the facts asserted by him, you must find him not guilty.

After the jury had returned with a verdict of guilty:

CHASE, Circuit Justice. Mr. Cooper, as the jury have found you guilty, we wish to hear any circumstances you have to offer in point of the mitigation of the fine the court may think proper to impose on you, and also in extenuation of your punishment. We should therefore wish to know your situation in life, in regard to your circumstances. It will be proper for you to consider of this. As you are under recognizance, you will attend the court some time the latter end of the week. (The court appointed Wednesday.)

Proceedings on Wednesday, April 30, 1800.

CHASE, Circuit Justice. Mr. Cooper, have you anything to offer to the court previous to passing sentence?

Mr. Cooper. The court have desired me to offer anything relating to my circumstances in mitigation of the fine, or any observation that occurs to me in extenuation of the offence. I have thought it my duty (not for the purpose of deprecating any punishment which the court may deem it proper to inflict, but) to prevent any accidental or apparent harshness of punishment on part of the court, for want of that information which it is in my power to give. For this reason, therefore, and that the court may not be misled, I think it right to say, that my property in this country is moderate. That some resources I had in England, commercial failures there have lately cut off: that I depend principally on my practice: that practice, imprisonment will

annihilate. Be it so. I have been accustomed to make sacrifices to opinion, and I can make this. As to circumstances in extenuation, not being conscious that I have set down aught in malice, I have nothing to extenuate.

CHASE, Circuit Justice. I have heard what you have to say. I am sorry you did not think proper to make an affidavit in regard to your circumstances; you are a perfect stranger to the court, to me at least. I do not know you personally—I know nothing of you, more than having lately heard your name mentioned in some publication. Every person knows the political disputes which have existed amongst us. It is notorious that there are two parties in the country; you have stated this yourself. You have taken one side—we do not pretend to say, that you have not a right to express your sentiments, only taking care not to injure the characters of those to whom you are opposed. Your circumstances ought to have been disclosed, on affidavit, that the court might have judged as to the amount of the offence; nor did we want to hurt you, by this open disclosure.

Mr. Cooper. I have nothing to disclose that I am ashamed of.

CHASE, Circuit Justice. If we were to indulge our own ideas, there is room to suspect that in cases of this kind, where one party is against the government, gentlemen who write for that party would be indemnified against any pecuniary loss; and that the party would pay any fine which might be imposed on the person convicted. You must know, I suppose, before you made any publication of this kind, whether you were to be supported by a party or not, and whether you would not be indemnified against any pecuniary loss. If the fine were only to fall on yourself, I would consider your circumstances; but, if I could believe you were supported by a party inimical to the government, and that they were to pay the fine, not you, I would go to the utmost extent of the power of the court. I understand you have a family, but you have not thought proper to state that to the court. From what I can gather from you, it appears that you depend on your profession for support; we do not wish to impose so rigorous a fine as to be beyond a person's abilities to support, but the government must be secured against these malicious attacks. You say that you are not conscious of having acted from malicious motives. It may be so; saying so, we must believe you; but, the jury have found otherwise. You are a gentleman of the profession, of such capacity and knowledge, as to have it more in your power to mislead the ignorant. I do not want to oppress, but I will restrain, as far as I can, all such licentious attacks on the government of the country.

Mr. Cooper. I have been asked by the court whether, in case of a fine being imposed upon me, I shall be supported by a party. Sir, I solemnly aver, that throughout my life, here and elsewhere, among all the political questions in which I have been concerned, I have

never so far demeaned myself as to be a party writer. I never was in the pay or under the support of any party; there is no party in this, or any other country, that can offer me a temptation to prostitute my pen. If there are any persons here who are acquainted with what I have published, they must feel and be satisfied that I have had higher and better motives, than a party could suggest. I have written, to the best of my ability, what I seriously thought would conduce to the general good of mankind. The exertions of my talents, such as they are, have been unbought, and so they shall continue; they have indeed been paid for, but they have been paid for by myself, and by myself only, and sometimes dearly. The public is my debtor, and what I have paid or suffered for them, if my duty should again call upon me to write or to act, I shall again most readily submit to. I do not pretend to have no party opinions, to have no predilection for particular descriptions of men or of measures; but I do not act upon minor considerations; I belong here, as in my former country, to the great party of mankind. With regard to any offers which may have been made to me, to enable me to discharge the fine which may be imposed, I will state candidly to the court what has passed, for I wish not to conceal the truth; I have had no previous communication or promise whatever, I have since had no specific promises of money or anything else. I wrote from my own suggestions. But, many of my friends have, in the expectation of a verdict against me, come forward with general offers of pecuniary assistance; these offers I have, hitherto, neither accepted nor rejected. If the court should impose a fine beyond my ability to pay, I shall accept them without hesitation; but if the fine be within my circumstances to discharge, I shall pay it myself. But the insinuations of the court are ill founded, and if you, sir, from misapprehension or misinformation have been tempted to make them, your mistake should be corrected.

PETERS, District Judge. I think we have nothing to do with parties; we are only to consider the subject before us. I wish you had thought proper to make an affidavit of your property. I have nothing to do, sitting here, to inquire whether a party in whose favour you may be, or you, are to pay the fine. I shall only consider your circumstances, and impose a fine which I think adequate; we ought to avoid any oppression. It appears that you depend chiefly upon your profession for support. Imprisonment for any time would tend to increase the fine, as your family would be deprived of your professional abilities to maintain them.

CHASE, Circuit Justice. We will take time to consider this. Mr. Cooper, you may attend here again.

Thursday, Mr. Cooper attended, and the court sentenced him to pay a fine of four hundred dollars; to be imprisoned for six months, and, at the end of that period, to find surety for his good behaviour, himself in a thousand, and two sureties in five hundred dollars each.

NOTE. Judge Chase's conduct in this case, which was marked with a moderation in strong contrast with the harshness afterwards exhibited in the prosecution of Callender [Case No. 14,709], was ably defended by Mr. Harper, in a speech on the sedition act, in the house of representatives in January, 1801 (Harper's Works, 375), and was not thought sufficiently marked, to entitle it even to a nominal place in the memorable articles of impeachment, of November, 1804. Mr. Cooper's defence, however, so written out by himself as to make up a review of the whole administration, attracted great attention; and his imprisonment for an offence thought so trivial, was a popular subject for electioneering declamation. Mr. Adams himself thought the thing had gone too far, and would have pardoned him, had not Mr. Cooper issued a letter, in which he told him, that, so far from asking for clemency, he would not "accept" it, unless coupled with an acknowledgment by the president of the breach of good faith which the publication of the alleged provocatory letter involved. See Aurora, for May 10, 1700. Of course nothing could be done but let the imprisonment run out. This it did, and the fine was paid. Forty years afterwards, at the same time with that imposed upon Lyon [Case No. 8,646], it was repaid with interest. In Porcupine, Mr. Cooper, as well as Dr. Priestley, were among the principal subjects of ridicule and denunciation; but, perhaps, the most bitter notice taken of them by Cobbett, was a poem called "Prison Eclogue," published by him in London, in 1801, and afterwards incorporated in Porcupine's works. The student will find in the Aurora of May 6, May 9, and May 19, papers of some interest emanating from Mr. Cooper on the subject of the trial in the text.

Mr. Cooper's life, however, is so connected with American history, as to require more than a general notice. He was born in London in 1759, and was educated at Oxford. Intended for the law, he did not confine himself to merely legal studies, but devoted himself with great success to the natural sciences, particularly chemistry, over which he soon obtained a mastery. His professional studies, so far as his history shows, never were very severely conducted; and soon after his advent at the bar, he allowed himself to be carried into another orbit, by accepting an ambassadorship from a democratic club in England, to a democratic club in France. For this both he, himself, and his patron, Mr. Watt, of steam-engine fame, from whom his diplomatic credentials had issued, were assailed in the house of commons by Mr. Burke. This gave Mr. Cooper an opportunity which he but too gladly seized; and at once there issued a pamphlet reply, which made up for the want of vivacity of its style by the excessive inflammation of its temper. "As long as you sell this at a high price," said Sir John Scott, "you can do no harm; but the moment it is turned into a penny slip, that moment I will prosecute you." This kindly caution of course shrunk the circulation of the "reply," and the result was, that Mr. Cooper, abandoning for a time politics, undertook to introduce into practice in Manchester, the important secret of extracting chlorine from common salt, which though afterwards so valuable, he was not then able to bring into successful operation.

Leaving the wreck both of business and of political fortune, Mr. Cooper at last made up his mind to accompany Dr. Priestley to America, not free, it must be admitted,—at least so far as Dr. Priestley is concerned,—from the conviction that, resist it as they might, the young republic would soon press them into the ranks of its law-makers. But this seemed to be a mistake, and the result was, that Mr. Cooper soon went into a violent opposition to Mr. Adams, the then president, not, however, until he had first some-

what circuitously intimated that he might accept the post of commissioner of the British treaty. Of this opposition, the prosecution in the text was the fruit. On coming out of prison, Mr. Cooper found the minority rapidly turning into a majority, and in a short time, the administration which had prosecuted him was overthrown. His untiring industry, his almost universal philosophical attainments, and his courageous temper, but more particularly the sufferings he had undergone in the maintenance of the freedom of the press, placed him high in the esteem of the dominant party. After having been appointed a commissioner to negotiate a settlement of the Luzerne difficulties in Pennsylvania—a duty he discharged with remarkable skill and success—he was nominated by Governor McKean to the president judgeship of a judicial district.

Mr. Cooper's proceedings after he became the wielder of judicial power, form an odd sequel to his experience when he was its subject. Scarcely five years had passed after he was out of prison, before he was on the bench; and scarcely five years more had passed before he was impeached before the senate of Pennsylvania, upon charges, which, were it not that they were gravely preferred and amply supported, might be considered burlesques of those upon which he was instrumental in impeaching Judge Chase, in the senate of the United States. He was charged with pouncing upon delinquent jurors on the first day of the court, with fines and bench warrants, in violation of the venerable Pennsylvania practice, of giving them the quarto die post; with imprisoning a Quaker for not pulling off his hat; with committing three parties for "whispering," an offence for which he declared he would hear no apology; with issuing warrants without previous oath, and then committing the constables who refused to serve them; with insisting in one case in examining under oath, a prisoner charged with crime, as to his own guilt; with sending private notes to juries in criminal cases, tending to extract a verdict of guilty; with carting a Luzerne convict to the Philadelphia prison, a thing not then provided for, which ended in the convict being kept in abeyance by the Philadelphia jailor, who refused to receive him, and the court who refused to take him back, thereby, under his new ambulatory commitment, withdrawing the sheriff from his public duties; and with brow-beating counsel, witnesses and parties, in cases so numerous as to make their recapitulation cover three pages. The Presbyterian and Quaker professions, he was charged with declaring in open court, to be "all damned hypocrisy and nonsense;" and divers specifications were given of illegal interference on his part in the profits of cases before him, and of private speculations in interests which were to pass under his adjudication. On February 21, 1811, these charges having been formally laid before the Pennsylvania house of representatives, were referred to a committee, who two days afterwards reported, that the evidence produced before them sufficiently substantiated the specifications of passionate and oppressive judicial bearing, leaving, however, the accusation of peculation without any further basis than that afforded by an imprudent purchase of certain property, sold at sheriff's sale under process from the court, a transaction which, though clear from any moral stain, the committee thought to be of doubtful propriety and dangerous precedent. They submitted, in conclusion, a resolution, "that a committee be appointed to draft an address to the governor for the removal of Thomas Cooper, Esq., from the office of president judge of the Eighth judicial district of Pennsylvania." Under this resolution, which passed 73 to 20, a committee was appointed which reported an address to the governor, which was carried 59 to 34, in the face of a very powerful protest by Mr. Gibson, now chief justice of Pennsylvania, who took the ground that the offences specified by the committee were misdemeanours, cognizable by impeachment alone. To this was joined a paper, in which the greater portion of the minority joined, declaring, that whatever may have been the peculiarities of manner of Mr. Cooper, there was no evidence which showed judicial misconduct. Under the Pennsylvania constitution, the governor "may," on address from the legislature, remove a judge from office; and, as Governor Snyder on a former occasion, when the attempt had been made to shake off the judges of the supreme court, had declared that "may" sometimes means "won't," a vigorous effort was now made to induce him to give once more the same lenient grammatical construction. The governor, it seems, had been the client of Mr. Cooper in former times, and had lived with him for many years on terms of personal intimacy, but whether from this account he felt a greater delicacy in interfering, or whether, in fact, he thought that the case was one in which he ought not to defeat the legislative will, the only reply he made, was a note through the secretary of the commonwealth, announcing that Mr. Cooper's judicial tenure was closed.

Of this procedure, in everything but its result, a duodecimo of the more solemn trial, which in the senate of the United States Judge Chase was the subject, not the least remarkable feature was, that it was carried on, with a few exceptions, by the very party of which Mr. Cooper had been lately one of the most lively leaders, and for which,—if political persecution by an outgoing administration is to be considered as a calamity,—he was one of the greatest sufferers. It may be that, like Callender, he felt a natural disgust when he found that under Mr. Jefferson, many men were put ahead of him who had not received the honours of martyrdom under Mr. Adams; or it may be that when he got on the bench,—for which, by the way, he had not received the necessary professional training,—he became subject to that nervous debility by which the most plethoric patriotism is sometimes there prostrated; but it is certain that very soon he cooled towards the Democrats, and, as was alleged in the evidence before the house committee, even went so far as to drop, when in court, expressions by no means complimentary to their persons, or their doctrines. This change—though not the overt acts said to have sprung from it—he confesses in an address issued from him at the close of the proceedings, at Lancaster, April 4, 1811. "Nor have I been anxious to conceal," he says, "that during a long course of observation on the conduct of parties in this country, I have not found that the Democrats or Republicans have much reason to boast of more disinterested views, or more tolerant principles, than their opponents. I have long found it impossible for me to go all lengths with the party to which I belonged, and, of course, I have shared the fate of all moderate men; I have influence with no party, and have willingly and deliberately incurred the decided hatred of the most violent and thorough going of my own. I went over to France in 1792, an enthusiast, and I left it in disgust. I came here; and seventeen years experience of a democratic government in this country, has also served to convince me it may have its faults; that it is not quite so perfect in practice, as it is beautiful in theory, and that the speculations of my youth do not receive the full sanction of my maturer age; nor do I find that justice and disinterestedness, wisdom, and tolerance, are the necessary fruits of universal suffrage, as it is exercised in Pennsylvania, for these are not always the qualifications that procure a man to be sent as the representative of the people."

Mr. Cooper's fine chemical acquirements, which, during all the storms of his eventful life, had never been submerged, now gave him a safe retreat. He was first placed in a philosophical professorship in Dickinson College, and afterwards in a highly honourable post in the University of Pennsylvania, which he finally abandoned for the chemical chair in Columbia College, South Carolina, of which he soon became president. In the nullification struggle he took

a bold part, issuing documents of the most ultra states' rights tone, and showing that if he had added nothing to the sprightliness, he had lost nothing of the fire, of the pamphleteer of 1795–1800. He died in 1840, when engaged in revising the South Carolina Statutes, a duty charged on him by the legislature, after having published, besides numberless tracts on politics, divinity, and metaphysics, a treatise on the bankrupt laws, a translation of Justinian, a treatise on political economy, a manual of chemistry, as well as a general compendium of useful information.

[The defendant applied to the court for a letter to be addressed to several members of congress requesting attendance as witnesses on his behalf, which motion was refused. See Case No. 14,861.]